UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
BARRY MORSTON,

                Plaintiff,                      **MEMORANDUM AND ORDER**
                                                            14-CV-5079 (RRM) (SJB)
       -against-

THE CITY OF NEW YORK; and NEW YORK
POLICE DEPARTMENT OFFICER
RAMON E. CABRAL, SHIELD # 23532,

                Defendants.
------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Barry Morston brings this action against defendants the City of New York (the "City") and New York Police Department Officer Ramon E. Cabral alleging, *inter alia*, false arrest and malicious prosecution in violation of his constitutional rights. (*See* Compl. (Doc. No 1); Am. Compl. (Doc. No. 20); Second Am. Compl. (Doc. No 31).) The City and Officer Cabral moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that the officers had probable cause to arrest Morston, and that an active arrest warrant against Morston at the time of his arrest defeats his false arrest claim as a matter of law. (*See* Defs.' Mot. (Doc. No. 48).) Morston opposes the motion and cross-moves for summary judgment. (*See* Pl.'s Mot. (Doc. No. 56).) For the reasons that follow, the City's motion is granted and Morston's motion is denied.

## BACKGROUND

      Unless otherwise noted, the following facts are undisputed and taken from the parties' Local Rule 56.1 Statements. On October 8, 2011, an unknown individual called 911 about a woman screaming at the Sunny 39 Hotel, located at 517 39th Street in Brooklyn. (Defs.' 56.1 (Doc. No. 50) at ¶ 6.) Sergeant Ann Marie Guerra and Officer James Daly responded to the call.

(*Id.* at ¶ 7.) On the third floor of the hotel, the officers encountered two men, later identified as Louis Marino and Felipe Rodriguez, coming out of a staircase. (*Id.* at ¶¶ 8–9.) One of the men had pantyhose over his face and was wearing a backpack and rubber gloves, and holding an expandable baton. (*Id.* at ¶ 8.) At this point, defendant Officer Cabral and Sergeant Nicholas Peragine arrived at the hotel to provide backup and met with Sergeant Guerra and Officer Daly. (*Id.* at ¶ 10.)

Sergeant Guerra detained Marino, the man with the expandable baton. (*Id.* at ¶ 13.) The other man, Rodriguez, pushed past Sergeant Guerra and said that he was staying in a room on that floor. (*Id.* at ¶ 14.) Officer Cabral and Sergeant Peragine followed Rodriguez into Room 312 where the officers observed Rodriguez throw what appeared to be a gun under the bed. (*Id.* at ¶¶ 15–16.) The officers retrieved the object – subsequently determined to be an imitation pistol. (*Id.* at ¶¶ 17–18.) Rodriguez began inching toward a bag near him. (*Id.* at ¶ 19.) The officers searched that bag and recovered a large amount of heroin. (*Id.* at ¶ 20.) The officers then searched the bag Marino was carrying and recovered duct tape, a pillow case, and rubber gloves. (*Id.* at ¶ 21.) Rodriguez and Marino were placed under arrest. (*Id.* at ¶ 22.)

Rodriguez told the officers, including Officer Cabral, that he was at the hotel to rob a man who had robbed him previously. He described that man as a "skinny white guy" who was originally staying in a room on the fourth floor of the hotel, but was now staying in Room 301 where, he said, the officers would find drugs, money, and a loaded firearm. (Pl.'s 56.1 (Doc. No. 56-1) at ¶¶ 20–21.) The officers confirmed with hotel staff that the person staying in Room 301, Andre Deluca, had switched rooms from the fourth floor. (Defs.' 56.1 at ¶ 28.) The officers then called for backup and waited outside Room 301. (*Id.* at ¶¶ 29–30.)

At this point, the parties dispute what occurred in and around Room 301. Morton largely relies on the testimony of Officer Cabral, and the City, for purposes of summary judgment, has "adopt[ed] plaintiff's version of the events regarding his location within, and exit from, Room 301 when the officers initially encountered him." (Defs.' Mot. at 3 n.1; Defs.' 56.1 at 7 n.2.) According to Officer Cabral, the door to Room 301 opened while the officers were waiting in the hallway. (Cabral Dep. (Doc. No. 52-1) at 116.) A black man, Morston, exited Room 301, saw the officers in the hallway, and bolted back into the room. (*Id.* at 118) The door remained slightly ajar. (*Id.*) The officers then gave commands for Morston to come out of the room. (*Id.*) Morston responded to the orders by coming out of the room and either throwing himself on the ground, or being pulled to the ground by one of the officers. (*Id.* at 119–121.) With firearms drawn, Officer Cabral and another officer placed Morston in handcuffs. (*Id.* at 121.) Another officer yelled commands into Room 301, and the other occupant, later identified as Andre Deluca, responded in sum and substance, "I'm not coming out, you guys are going to shoot me." (*Id.* at 126.) The officers continued to instruct Deluca to come out, but he responded, "I'm on the ground, I got nothing on me." (*Id.* at 127.)

Officer Cabral and another officer entered the room and observed that the toilet was actively flushing and that Deluca was on the ground. (*Id.* at 127–128.) The officers observed on the floor next to his body a 9-millimeter firearm, ammunition, and a box containing approximately $50,000 cash. (*Id.* at 128; Pl.'s 56.1 at ¶¶ 50–55.) Room 301 contained a bathroom, two beds, a nightstand between the two beds, a television on the left corner of the wall, a window, and no closet. (Defs.' 56.1 at ¶ 47.)[1]

---

[1] Morston's own version of the events differs from that of Officer Cabral's version. According to Morston's deposition, with the officers poised outside of Room 301, Deluca began to open the door to the room, and the police pushed inside. (Morston Dep. (Doc. No. 49-7) at 52, 54.) The door to Room 301 was open only a crack when the officers entered. (*Id.* at 54.) The officers told Morston and Deluca to freeze and get down on the floor, and they

3

Officer Cabral arrested Deluca and Morston for, *inter alia*, possession of a firearm. (*Id.* at ¶ 40.) On October 9, 2011, Morston was charged by the Kings County District Attorney's Office with Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Fourth Degree. (*Id.* at ¶ 49.) It was later discovered that at the time of Morston's arrest for possession of a firearm, there was an active warrant for his arrest on unrelated charges. (*Id.* at ¶ 3.) On October 12, 2011, Morston was rearrested on those charges at Rikers Island. (*Id.* at ¶ 50.) On April 11, 2012, the criminal charges related to possession of a weapon in Room 301 were dismissed. (*Id.* at ¶ 51.)

Morston contends that the officers lacked probable cause for his arrest. The City argues that Officer Cabral had probable cause to arrest Morston for constructive possession of a firearm. For the reasons set forth below, Officer Cabral's actions were lawful, and the City's motion for summary judgment is granted.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

complied. (*Id.* at 52, 54.) Morston was on the bed at the time, and Deluca was by the door. (*Id.* at 52–53.) The officers then proceeded to search both Morston and Deluca inside Room 301. (*Id.* at 53.) The officers then placed Morston in handcuffs and took him into the hallway, and, from that position, Morston could no longer see inside the room. (*Id.* at 54.) There is no dispute that the officers recovered the firearm inside Room 301. As discussed below, even adopting Morston's own version of the events surrounding the entry into Room 301 and the recovery of the firearm, the City is entitled to summary judgment.

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## DISCUSSION

### I. False Arrest

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime."

*Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). But a police officer may make an investigatory "Terry stop," "as long as the officer has reasonable suspicion that the person to be detained is committing or has committed a criminal offense." *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016). Reasonable suspicion requires less than probable cause – the standard is "not high." *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (internal citation omitted). Reasonable suspicion and probable cause are both assessed objectively, based on what a reasonable officer would conclude under the totality of the circumstances. *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015). As such, the officer's belief and "subjective intent do[] not calculate into the analysis" of whether a stop constitutes an investigatory detention, or an arrest. *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004).

Here, under the totality of the circumstances, the officers' conduct – including their initial detention of Morston in the hallway outside of Room 301 and his ultimate arrest for possession of the firearm recovered from inside Room 301 – was reasonable and entirely lawful. At the time they arrived outside of Room 301, the officers, including Officer Cabral, had encountered Marino, who was holding an expandable baton and wearing pantyhose over his face, and Rodriguez, who attempted to surreptitiously discard what appeared to be a pistol. Consistent with the story that they were at the hotel to commit a robbery, the officers recovered from Rodriguez and Marino a large amount of heroin, duct tape, a pillow case, and rubber gloves. The officers had also been told that they would find the "skinny white man" that they had come to rob in Room 301 together with more drugs, guns, and money. The officers confirmed an important aspect of Rodriguez's story: that the person they came to rob had moved from the fourth floor of the hotel to Room 301. Under these circumstances, the officers could reasonably believe that there may be dangerous and/or illicit activity in and around Room 301 of the hotel.

6

*See United States v. Rueda*, 549 F.2d 865, 869 (2d Cir. 1977) ("[A] confessed participant in a crime is no informant in the usual sense.") (internal quotation marks omitted); *United States v. Jackson*, 560 F.2d 112, 121 (2d Cir. 1977) ("[T]here is no need to show past reliability when the informant . . . is in fact a participant in the very crime at issue"); *see also United States v. Marin Moreno*, No. 08-CR-605 (CPS), 2009 U.S. Dist. LEXIS 14405, at *16 (E.D.N.Y. Feb. 24, 2009) ("Information from an untested informant may be sufficiently reliable if as here it is corroborated in material respects by independent evidence, even if those respects are innocent.") (internal quotation marks omitted); *Nelson v. Hernandez*, 524 F. Supp. 2d 212, 222 (S.D.N.Y. 2007) ("If an informant's information has been corroborated in material respects, the entire account may be credited, including parts without corroboration.")

Once outside Room 301, Officer Cabral encountered Morston for the first time as Morston exited the room. Officer Cabral ordered him to get down on the ground, but instead, Morston ignored the order and fled back into the room, leaving the door slightly ajar. Morston's furtive conduct in re-entering the room only served to heighten their reasonable belief that he may be involved in criminal activity, or that their safety was at risk. *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (finding that an individual's "evasive conduct" at the sight of police officers gave rise to reasonable suspicion because it corroborated an informant's tip that "criminal activity was afoot") (citing *Wardlow*, 528 U.S. at 125) ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). That Officer Cabral did not know whether Morston was a victim or a perpetrator, as Morston's stresses, only added to the officers' reasonable belief that the officers and the occupant(s) of Room 301 were in danger.

7

Under these circumstances, Officer Cabral was justified in detaining Morston. *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) (During a *Terry* stop, "a law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exits.") "[A]lthough under ordinary circumstances, drawing weapons and using handcuffs are not part of a Terry stop, intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) (handcuffing a potentially armed suspect to search him for a firearm was not an arrest); *see also Grice v. McVeigh*, No. 15-CV-4124, 2017 U.S. App. LEXIS 18831, at *11 (2d Cir. 2017) (finding that a Terry stop did not ripen into an arrest where, for safety reasons, an officer kept a suspect in handcuffs for the duration of a thirty-three minute investigation).

Mere moments after detaining Morston, Officer Cabral entered Room 301 and recovered the 9-millimeter firearm. At that moment, Officer Cabral had probable cause to arrest Morston for constructive possession of a firearm.[2] "The doctrine of constructive possession allows the police to find probable cause to arrest anyone in a dwelling when," as here, "contraband is discovered in plain view and it reasonably appears that all members of the dwelling exercised dominion and control over the area in which the contraband is found." *Takacs v. City of New York*, No. 09-CV-481 (LBS), 2011 WL 8771384, at *3 (S.D.N.Y. Jan. 24, 2011); *accord United*

---

[2] Even assuming, *arguendo*, that the initial stop of Morston was unlawful – which the Court finds it was not – Morston would be entitled to damages only for the very brief period between Morston's detention in the hallway and the officers' discovery of the gun in Room 301. *See Townes v. City of New York*, 176 F.3d 138, 149 (2d Cir. 1999) (limiting plaintiff's damages to the time between an initial unlawful act and the discovery of evidence because the officers "certainly had probable cause to arrest him upon discovery of the handguns").

8

*States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001) ("It is of no moment that other individuals also may have exercised control over the weapons.").[3]

For the reasons set forth above, taking the facts in the light most favorable to Morston and, for purposes of this motion, adopting the version of events on which Morston wishes the Court to rely, Officer Cabral's actions were lawful at every stage, and Morston's arrest was supported by probable cause. As such, Morston's false arrest claim fails.[4]

## II.     Qualified Immunity

Even assuming that the officers lacked either reasonable suspicion for the *Terry* stop or probable cause for the arrest, Officer Cabral is entitled to qualified immunity. "Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was arguable probable cause to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). For purposes of qualified immunity, the Court is not concerned with the "correctness" of the officer's conduct, but the "objective reasonableness" of his course of action under the totality of the circumstances. *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). That is, if the

---

[3] Morston does not bring a claim for unlawful entry into Room 301. However, he contends that if the officers' entry into Room 301 was unlawful, then the gun that was uncovered after the unlawful entry cannot be used against him, and thus, there was no probable cause to arrest him. (Pl.'s Mot. at 4). Morston's argument is without merit. "The fruit of the poisonous tree doctrine is 'inapplicable to civil § 1983 actions.'" *DiMascio v. City of Albany*, 205 F.3d 1322, at *1 (2d Cir. 2000) (quoting *Townes*, 176 F.3d at 145, 149). The same analysis applies to Morston's contention that the gun was seized unlawfully because it was not in "plain view" at the time the officers recovered it. (Pl. Mot. at 4.)

Finally, the City argues that because there was an active warrant for his arrest on other charges, Morston "possessed no constitutional right to be free from seizure." (Def. Mot. at 18 (citing *Banks v. Fuentes*, 545 F. App'x 518 (7th Cir. 2013); *Atkins v. City of Chicago*, 631 F.3d 823 (7th Cir. 2011)).) However, in *Banks* and *Atkins*, the officers discovered an active arrest warrant in the moments between an arguably unlawful *Terry* stop, and an arrest upon that warrant. Applying the fruit of the poisonous tree doctrine, the Seventh Circuit found that the unlawful stop had no bearing on the otherwise lawful arrest. Here, the officers had no knowledge of the active arrest warrant against Morston before arresting him, and, thus, *Banks* and *Atkins* are inapposite.

[4] Even under the version of facts set forth in Morston's own deposition, the officers' conduct was reasonable. According to Morston, he was arrested inside Room 301. *See* Morston Deposition (Doc. No. 49-7) at 54.) After the officer's discovered the firearm, the officers had probable cause to arrest Morston for its constructive possession.

9

police officer's actions were not "plainly incompetent," *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996), or if "reasonable officers could disagree about the legality of the officer's conduct under the circumstances," then summary judgment is appropriate. *Lennon*, 66 F.3d at 421.

Given the totality of the circumstances, and for the same reasons discussed above, it is far from the case that "no officer of reasonable competence could have made the same choice in similar circumstances." *See Lennon*, 66 F.3d 416, 420–21. Officer Cabral is entitled to qualified immunity, and the City's motion for summary judgment as to Morston's false arrest claim is granted.

### III.        Remaining Claims

Morston also brings claims for malicious prosecution, abuse of process, and municipal liability.[5] Each is without merit.

The existence of probable cause at the time of arrest defeats both malicious prosecution and abuse of process claims. *See Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010); *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). To state a claim for malicious prosecution under New York law, Morston must, in part, cite facts suggestive of "actual malice." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). As to malicious abuse of process, Morston must establish, in part, that defendants acted "in order to obtain a collateral objective that is outside legitimate ends of process." *Savino*, 331 F.3d at 76 (internal quotation marks omitted). Here, Morston has failed to introduce any evidence suggestive of either "actual malice," or a "collateral objective." Accordingly, Morston's malicious prosecution and abuse of process claims are dismissed.

---

[5] Morston does not address any of these claims in his motion papers.

In order to prove municipal liability, Morston must prove the existence of a municipal policy or custom with a causal link to the deprivation of his constitutional rights. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978). "[M]ere assertions," such as those levied by Morston, are insufficient to sustain a *Monell* claim. *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993). Accordingly, Morston's municipal liability claim is dismissed.

## CONCLUSION

For the reasons stated above, the City and Officer Cabral's motion for summary judgment (Doc. No. 48) is granted and Morston's cross-motion for summary judgment (Doc. No. 56) is denied.

The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: Brooklyn, New York
September 28, 2017

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge

11